# EXHIBIT 1

| | |
|---|---|
| NEW LONDON TOBACCO MARKET, INC. | ) |
| and FIVEMILE ENERGY, LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) No. 6:17-cv-00245-CFVT |
| JAMES C. JUSTICE COMPANIES, INC., | ) |
| KENTUCKY FUEL CORPORATION, | ) |
| JUSTICE MANAGEMENT SERVICES, LLC, | ) |
| JUSTICE FARMS OF NORTH CAROLINA, | ) |
| LLC, OAKHURST CLUB, LLC, | ) |
| SOUTHERN MINERALS, LLC, BLUESTONE | ) |
| INDUSTRIES, INC., DYNAMIC ENERGY, | ) |
| INC., JCJ COAL GROUP, LLC, BLUESTONE | ) |
| RESOURCES, INC., JAMES C. JUSTICE, III, | ) |
| and JAMES C. JUSTICE, II, | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

Plaintiffs, New London Tobacco Market, Inc. ("NLTM"), and Fivemile Energy, LLC, by and through counsel, pursuant to Rule 15, Fed. R. Civ. P., for their Second Amended Complaint against the Defendants state as follows:

### The Parties, Principal Actors and Jurisdiction

1.      NLTM is a corporation chartered under the laws of Kentucky with its principal place of business in London, Kentucky.

2.      Fivemile Energy, LLC ("Fivemile") is a limited liability company organized under the laws of the State of Tennessee with its principal place of business in Tennessee.  Its members are William G. Brownlow, IV and his wife, Cassandra Brownlow, both of whom are citizens of Tennessee.  Fivemile is the agent for NLTM and brings this action in its capacity as an agent, and for the benefit of NLTM.

3.      James C. Justice, III ("Jay Justice") is a citizen of the State of Virginia. He is a director and president or executive vice president of the following companies that do business in Kentucky:  James C. Justice Companies, Inc. ("JCJC"), Kentucky Fuel Corporation ("Kentucky Fuel"), Southern Coal Corporation, A & G Coal Corporation, Infinity Energy, Inc., Virginia Fuel Corporation, Justice Low Seam Coal Mining, Inc. and Beech Creek Coal.

4.      Dr. Jillean L. Justice ("Jill Justice") is a citizen of West Virginia.  She is not named as a Defendant in this action, but is a member of the limited liability companies identified below that are Defendants.

5.      James C. Justice, II is a citizen of the State of West Virginia. He is the current governor of the State of West Virginia, and will be referred to herein as "Governor Justice."[1] Governor Justice is or was a member of certain limited liability companies identified below, including those that are also named as Defendants.  He is the father of Jay Justice and Jill Justice.

6.      JCJC is a corporation chartered under the laws of Delaware with its principal place of business in Virginia.  Upon information and belief, its shareholders are Governor Justice, Jay Justice and Jill Justice.  Jay Justice previously was its executive vice president and Governor Justice was its president.

7.      Kentucky Fuel is a corporation chartered under the laws of Delaware, with its principal place of business in West Virginia.  Jay Justice has been its executive vice president. Jay Justice is now its president.

8.      Justice Management Services, LLC ("Justice Management Services") is a corporation chartered under the laws of Virginia, with its principal place of business in Virginia.

---

[1] Governor Justice was not the Governor of West Virginia at the time of many of the transactions described herein.  He is referred to herein as "Governor Justice" out of respect for his office.

Upon information and belief, it and/or its members are affiliates of JCJC and/or members of the Justice Family. Upon information and belief, its members are citizens of states other than Tennessee and Kentucky.

9. Justice Farms of North Carolina, LLC ("Justice Farms") is a limited liability company organized under the laws of Virginia with its principal place of business in Virginia. Upon information and belief, its members are Jay Justice and Jill Justice, who are citizens of Virginia and West Virginia, respectively. It is an affiliate and an insider of JCJC.

10. Oakhurst Club, LLC ("Oakhurst Club") is a limited liability company organized under the laws of West Virginia with its principal place of business in West Virginia. Its members are Governor Justice, Jay Justice, and Jill Justice, who are citizens of West Virginia, Virginia, and West Virginia, respectively. It is an affiliate and an insider of JCJC.

11. Southern Minerals, LLC ("Southern Minerals") is a former limited liability company organized under the laws of Virginia that had its principal place of business at 302 S. Jefferson Street, Roanoke, Virginia. Its status as a Virginia limited liability company recently was "cancelled." *See* Exhibit 1 to original Complaint. Upon information and belief its status is now "active." It is an affiliate and an insider of JCJC. Upon information and belief, its sole member is Southern Coal Corporation, which is a Delaware corporation with its principal place of business in Virginia.

12. Bluestone Industries, Inc. ("Bluestone Industries") is a corporation organized under the laws of West Virginia. Its officers are Governor Justice, James T. Miller, and Dr. Justice.

13. Dynamic Energy, Inc. ("Dynamic Energy") is a corporation organized under the laws of West Virginia. Its officers are Governor Justice, James T. Miller, and Dr. Justice.

14. JCJ Coal Group, LLC ("JCJ Coal Group") is limited liability company organized

3

under the laws of Delaware. Upon information and belief, its sole member is Bluestone Mineral, Inc., an inactive West Virginia corporation.

15.     Bluestone Resources, Inc. ("Bluestone Resources") is a corporation organized under the laws of Delaware.  Its members are Governor Justice and Jay Justice, who are citizens of West Virginia and Virginia, respectively.  It is an affiliate and insider of JCJC.

16.     The Defendants, James C. Justice, II and James C. Justice, III (the "Justices") own, directly or indirectly, a large number of corporations, limited liability companies and other entities, through which they engage in a wide range of activities.  These activities include coal mining, agriculture and the hospitality business, such as The Greenbrier Resort Hotel in West Virginia.  All of these entities are not known to the Plaintiffs, but upon information and belief they include the entities listed on Exhibits 30 hereto.

17.     The Justices and others are members of an association-in-fact enterprise (the "Justice Family Enterprise" or the "Enterprise"), the structure of which consists of the Justices, and entities that they control, including those listed on Exhibit 30 hereto, and a core group of loyal employees of various entities who will do what the Justices say. The identity of the entities that comprise the Enterprise changes from time to time but operate as a continuing unit distinct from the individual Defendants. It includes the entities identified herein. The purpose of the Enterprise is to utilize these entities for the Justices' own personal benefit and to utilize the entities to avoid having to pay debts owed by various members of the Enterprise.  This includes the transfer of assets from entities that have legal obligations that they do not wish to pay, to other entities in order to avoid payment of their debts.  Often this is contrary to the best interest of the entities themselves, but is intended to benefit the Justices.  Their business strategy often is to induce other persons into entering agreements based upon false representations that they or entities they control will perform those

4

agreements when, in fact, they do not intend to honor those agreements or pay the amounts due thereunder. This business strategy includes incurring debts that they do not intend to pay and using delay and forcing creditors to bring unnecessary litigation, so that the members of the Enterprise can avoid full payment of their debts. This business strategy also includes actions to deplete various of the entities of assets when they have incurred debts and to transfer such assets, including business opportunities, to other entities, in order to prevent creditors from being able to collect debts owed to them. Further, the Defendants and the Enterprise intentionally disregard and attempt to frustrate the judicial system's power and ability to provide relief to creditors. The Enterprise put this business strategy in effect through their dealings with the Plaintiffs as further detailed below.

18.     The Justice Family Enterprise's business strategy is well-known, and has been described in various published articles. *See, e.g.,* Patterson & Ohio Valley Resource, *"Companies Sue Justice Family Companies Over Debts, Find Bank Accounts Empty,"* West Virginia Public Broadcasting, (Oct. 2, 2018), and available on-line at http://www.wvpublic.org/post/companies-sue-justice-family-companies-over-debts-find-bank-accounts-empty#stream/0, and a recent Forbes magazine article titled "The Deadbeat Billionare: The Inside Story of How West Virginia Gov. Jim Justice Ducks Taxes and Slow-Pays His Bills," April 30, 2019, and available on-line at https://www.forbes.com/sites/christopherhelman/2019/04/09/the-deadbeat-billionaire-the-inside-story-of-how-west-virginia-gov-jim-justice-ducks-taxes-and-slow-pays-his-bills/#13265a972acc, copies of which are attached hereto as Exhibits 31 and 32, respectively. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of costs and interest. Additionally, this Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 by virtue of the fact that the Racketeer Influenced and Corrupt Organizations Act ("RICO") claim

arises under federal law (18 U.S.C. § 1962). Supplemental jurisdiction over the other claims is proper pursuant to 28 U.S.C. § 1367.

### Factual Background – Plaintiffs Become Creditors of JCJC and Kentucky Fuel

19.     The business dealings between Plaintiffs and JCJC began in 2005.  On October 5, 2005, NLTM and Kentucky Fuel Corporation ("Kentucky Fuel"), entered into "Assignment of Leases and Permits" (the "Original Assignment").   In that Original Assignment, among other things, NLTM assigned certain leases of mineral rights, known as the Deep Wood Leases and the Fivemile Leases, to Kentucky Fuel.

20.     On November 23, 2005, JCJC executed a Guaranty Agreement (the "Justice Guaranty"), pursuant to which, among other things, it guaranteed the obligations of Kentucky Fuel to NLTM under the Original Assignment.  To induce the Plaintiffs into these business dealings, the Justices had delivered to the Plaintiffs an audited Consolidated Financial Statements for JCJC and its subsidiaries for the year ended December 31, 2009. Those financial statements showed assets greater than $175 million, stockholders' equity greater than $48 million, and one-year net income of over $47 million. The Defendants intended for the Plaintiffs to rely upon this disclosure to induce Plaintiffs to do business with them and to conclude that any debt owed by the Defendants to the Plaintiffs could be paid.

21.     In the Original Assignment and the Justice Guaranty, JCJC agreed to pay Plaintiffs' reasonable attorneys' fees and expenses incurred as a result of any default or failure to perform by Kentucky Fuel or JCJC.

22.     On or about November 22, 2010, NLTM, Kentucky Fuel, Fivemile, JCJC and others entered into an agreement styled "Fourth Amendment of Assignment of Leases and Permits" (the "Fourth Amendment").

23.     In the Fourth Amendment, the parties agreed, among other things, to the following:

a.     Kentucky Fuel agreed to provide to Fivemile all payments due under the lease of property known as the "Strong Brothers property" within seven days of any request for such payment,

b.     Kentucky Fuel agreed to pay NLTM Monthly Retainer Fees of $10,000 per month, beginning on December 1, 2010.

c.     Article 14 provided as follows:

> 14.     **Costs**.  If any lawsuit, arbitration or other action is commenced or taken which arises out of or relates to this Agreement, the prevailing parties shall be entitled to recover from the defaulting party all costs, fees and expenses, including all attorney fees and expenses, in connection therewith.

d.     JCJC reaffirmed its obligations under the Justice Guaranty and confirmed that such obligations include the obligations of Kentucky Fuel in the Fourth Amendment as well as the obligations pursuant to the original Justice Guaranty.

24.     Kentucky Fuel has not paid the Monthly Retainer Fees as required by the Fourth Amendment.  As of the date this Second Amended Complaint is being tendered, the unpaid Monthly Retainer Fees are $970,000, consisting of the $10,000 per month from May 1, 2011, through April 1, 2019.  These Monthly Retainer Fees continue to accrue at the rate of $10,000 per month.

25.     Kentucky Fuel and JCJC have failed and refused to pay rents due under the leases of the Strong Brothers Property as required by the Fourth Amendment. Kentucky Fuel and JCJC have admitted that they owe the unpaid amounts for the Strong Brothers Leases.  As of the date this Second Amended Complaint is being filed, the principal amount of such payments owed by those Defendants is $20,000.

26.     JCJC and Kentucky Fuel have failed and refused to pay the amounts owed by Kentucky Fuel as required by the Justice Guaranty.

27.     Kentucky Fuel's and JCJC's failure to honor their contractual obligations described herein was intentional and was part of their business plan and strategy, as evidenced by their course of dealings whereby they have evidenced a pattern and practice of disregarding and refusing to pay their contractual obligations.

## The Original Federal Suit

28.     On May 8, 2012, Plaintiffs instituted an action in the United States District Court for the Eastern District of Kentucky styled *New London Tobacco Market, Inc., et al. v. Kentucky Fuel Corporation and James C. Justice Companies, Inc*., Case No. 12-91-GFVT (the "Fivemile Action").

29.     On September 30, 2014, this Court entered a default judgment against the Defendants in the Fivemile Action based upon the Defendants' violation of Court orders and discovery abuse.  This default judgment established the JCJC's liability for the Monthly Retainer Fees, the Strong Brothers Lease Payments and Plaintiffs' attorneys' fees and expenses.  It also entered judgment in favor of Plaintiffs and against JCJC for fraud and punitive damages.

30.     In the Fivemile Action, the Magistrate Judge issued a Report & Recommendation on January 17, 2017, recommending a judgment against JCJC in excess of $60,000,000.  The Court did not initially accept this recommendation, but referred the matter back to the Magistrate Judge for an evidentiary hearing and a Report and Recommendation regarding the amount of damages that should be awarded. This evidentiary hearing on damages was held on December 11-13, 2018, but as of the filing of this Second Amended Complaint, there has not been a final judgment in the Fivemile Action for the amount of damages, including the amount of attorneys' fees that the Court will award

pursuant to the default judgment against JCJC. However, the Court's Order of September 30, 2014, establishes that JCJC are liable to the Plaintiffs for breach of contract, fraud and punitive damages. The Defendants acted in utter disregard for the power of this Court, which resulted in this default judgment and their disdain for and efforts to impede the judicial system continue. Most recently, the Defendants sought to introduce a secretly-obtained "sworn statement" of Kent Gross in violation of a Court Order barring filings without first obtaining express permission of the Court. [D.E. 429] and [D.E. 430-1] (both of which were stricken by the Court). Further, to justify this violation, the Defendants falsely represented to the Court that they had "first learned of Kent Gross" in late March 2019, when the Defendants themselves had previously made numerous prior filings that showed their knowledge of and intent to rely upon the testimony of Mr. Gross.

## JCJC's Transfers of Assets

31.     After the filing and service of the Fivemile Action in May 2012, JCJC in combination with other persons and companies, began to engage in a series of transactions with the intent to hinder, delay or defraud its creditors. These transfers had the effect of draining the assets, stockholders' equity, and current and future net income shown on the 2009 Consolidated Financial Statements from JCJC to other related or cooperating entities and individuals. Upon information and belief, each of these transfers involved the use of the wires and/or mail and continued the purpose of the Enterprise of shielding assets and avoiding debts. As a consequence, the Defendants converted JCJC from a company who could make good on the Guaranty Agreement into one with no ability to pay. Some of these transfers were transfers of real estate to JCJC's related entities, insiders or affiliates made without valuable consideration for the real estate transferred. Others were transfers of valuable real estate in exchange for cash or other consideration that would make it more difficult for creditors, such as Plaintiffs, to collect their debts from JCJC. These fraudulent

conveyances include the transfers described below.  They are summarized in Exhibit 2 to the original Complaint.

**Transfers for No Consideration**

32.     Beginning in 2013 and continuing through at least 2016, JCJC engaged in numerous additional transfers with the intent to hinder, delay or defraud its creditors. These transfers described in the following paragraphs 34 through 40, were made to transferees that were affiliates and insiders of JCJC. JCJC did not receive consideration equal to a reasonably equivalent value of the properties transferred because no consideration was paid for any of these transfers. Upon information and belief, the Defendants used the United States mail and/or wire services in connection with these transfers.

33.     By Quitclaim Deed dated November 27, 2013, recorded on January 8, 2014 (Exhibit 3 to the original Complaint), JCJC transferred the mineral rights to approximately 929 acres in Marion County, South Carolina to Southern Minerals, LLC. There was no reasonably equivalent value received for the transfer.  Although the Deed includes a pro-forma recital that the stated consideration for this transfer was $5.00, it includes an affidavit that "no monies were exchanged" for the transfer.  This Deed was executed by Jay Justice on behalf of JCJC.

34.     On January 24, 2014 JCJC entered into a series of at least ten transactions by which it transferred valuable real estate in Pasquotank and Perquimans Counties, North Carolina to Justice Farms. These transactions were accomplished by deeds executed that date and recorded on February 5, 2014. Each of these deeds was executed by Jay Justice on behalf of JCJC.  There was no reasonably equivalent value received for the transfer for each of the property interests transferred. Although each contains a pro-forma recital of a stated cash consideration of $10.00, each also includes a certification that the consideration for the transfer was "$0.00." The properties

transferred are as follows:

a.      0.43 acres in Pasquotank County, North Carolina (Exhibit 4 to the original Complaint);

b.      69.25 acres in Pasquotank County, North Carolina (Exhibit 5 to the original Complaint);

c.      Two parcels containing 876.48 acres in Pasquotank County, North Carolina (Exhibit 6 to the original Complaint);

d.      Seventeen parcels containing 10+ acres in Pasquotank County, North Carolina (Exhibit 7 to the original Complaint);

e.      272 acres in both Pasquotank and Perquimans Counties, North Carolina (Exhibit 8 to the original Complaint);

f.      3.87 acres of the Tanglewood Industrial Park in Pasquotank County, North Carolina (Exhibit 9 to the original Complaint);

g.      A lot and right of way in in Pasquotank County, North Carolina for a stated consideration of $10.00 (Exhibit 10 to the original Complaint);

h.      Two subdivision lots in Pasquotank County, North Carolina for a stated consideration of $10.00 (Exhibit 11 to the original Complaint);

i.      A lot consisting of two tracts containing seven parcels of a subdivision in Pasquotank County, North Carolina (Exhibit 12 to the original Complaint); and

j.      3918 acres in Pasquotank County, North Carolina (Exhibit 13 to the original Complaint).

35.     By Special Warranty Deed dated August 12, 2014, recorded on August 15, 2014 (Exhibit 14 to the original Complaint), JCJC transferred 123.053 acres in Orange County, Virginia

to Justice Farms. The property interest transferred was in excess of the consideration for the transfer and there was no reasonably equivalent value received for the transfer. Although this Deed contains a pro forma recital that the stated consideration for this transfer was $10.00, the Deed certifies that no consideration was paid but that the assessed value of the property conveyed was $1,182,700. This Deed was executed by Jay Justice on behalf of JCJC.

36.     By Special Warranty Deed dated August 12, 2014, recorded on August 15, 2014 (Exhibit 15 to the original Complaint), JCJC transferred 1,559.527 acres in Orange County, Virginia to Justice Farms. The property interest transferred was in excess of the consideration for the transfer and there was no reasonably equivalent value received for the transfer. Although this Deed contains a pro forma recital that the stated consideration for this transfer was $10.00, the Deed certifies that no consideration was paid but that the assessed value of the Property conveyed was $7,288,700.00. This Deed was executed by Jay Justice on behalf of JCJC.

37.     By Special Warranty Deed dated October 19, 2014, recorded on October 20, 2014 (Exhibit 16 to the original Complaint), JCJC transferred 710 acres in Prince George County, Virginia to Justice Farms. The property interest transferred was in excess of the consideration for the transfer and there was no reasonably equivalent value received for the transfer. Although this Deed contains a pro forma recital that the stated consideration for this transfer was $10.00, the Deed also certifies that no consideration was paid because it was between related parties, but that the assessed value of the property conveyed was $1,277,400.00. This deed was executed by Jay Justice on behalf of JCJC.

38.     By Quitclaim Deed dated April 5, 2016, recorded on April 6, 2016 (Exhibit 17 to the original Complaint), JCJC transferred 500 acres in Monroe County, West Virginia to Oakhurst Club, LLC. Although this Deed contains a pro forma recital that the stated consideration for this

transfer was $10.00, it certifies that no consideration was paid because it was a quitclaim deed between related parties. The property interest transferred was in excess of the consideration for the transfer and there was no reasonably equivalent value received for the transfer. This Deed was executed by Stephen W. Ball on behalf of JCJC.

39.     By Special Warranty Deed dated May 9, 2016, recorded on May 10, 2016 (Exhibit 18 to the original Complaint), JCJC transferred four tracts of land comprising over 112 acres in Clarendon County, South Carolina to Justice Farms. There was no reasonably equivalent value received for the transfer. Although the Deed recites a pro-forma consideration for this transfer of "Five and no/100 ($5.00) Dollars and No Consideration to the Grantor in hand paid," it also includes an Affidavit stating that it is exempt from a recording fee because there was "No Consideration" for the transfer. This Deed was executed by Jay Justice on behalf of JCJC.

**Other Transfers by JCJC**

40.     In addition to the above fraudulent conveyances, JCJC has made, or agreed to make, other transfers of assets that Plaintiffs believe are made with the intent to hinder, delay or defraud Plaintiffs as creditors of JCJC. These include those described in the following paragraphs 42 through 47. Upon information and belief, the Defendants used the United States mail and/or wire services in connection with these transfers. Plaintiffs believe and therefore allege that the intent of JCJC and its Co-Conspirators (as defined below) has been and is to convert real property to cash or other assets that will be difficult to trace or that can be dissipated or hidden, with the intent to hinder, delay or defraud Plaintiffs and other creditors.

41.     By General Warranty Deed made on April 28, 2014, and executed by Jay Justice (Exhibit 19 to the original Complaint), JCJC transferred certain real property commonly described as 302 S. Jefferson Street, Roanoke, Virginia to 302 Jefferson, LLC, a Virginia limited liability

company. Upon information and belief, 302 Jefferson, LLC is an affiliate of JCJC. This deed recites that the consideration was $3,200,000.

42. By Special Warranty Deed dated November 25, 2014, and recorded on November 26, 2014 (Exhibit 20 to the original Complaint), JCJC transferred over 3900 acres in Clarendon County, South Carolina, to Jay Justice. An Affidavit with this deed recites that the consideration "paid or to be paid" is $13,500,000. Plaintiffs do not know if this amount has been paid or, if so, to whom. This deed was executed by Steve Ball.

43. Beginning in 2014, JCJC entered into agreements to sell over twenty thousand acres of real property located in North Carolina, South Carolina and Virginia to affiliates of Farmland Partners, Inc. ("FPI (REIT)"), a publically traded real estate investment trust organized under the laws of Maryland in two separate transactions. FPI (REIT) acquires farmland throughout the United States and then leases the farmland to others. Upon information and belief, Farmland Partners Operating Partnership ("FP Operating Partnership") is owned by FPI (REIT). FP Operating Partnership owns and operates several subsidiaries, including FPI Colorado, LLC ("FPI-CO") and FPI Carolinas, LLC ("FPI-CAR").These two transactions were pursuant to Real Estate Purchase Agreements signed on November 13, 2014 ("REPA I") and March 23, 2015 ("REPA II") and are described below.

a. The first real estate purchase agreement, REPA I, contracted to convey seven farms in Marion, Lee, Clarendon, and Sumter Counties, South Carolina to FPI-CO. On or about December 22, 2014, JCJC and Ten Mile Bay, LLC entered into REPA I with FPI-CO to transfer 6,819 acres of real property to FPI-CO for a purchase price of $28,000,000, payable by wire transfer. This purchase price was later amended to $27,450,000. REPA I allowed the sellers to lease back the property at a rate of $746,147 (later increased to

$764,727.54) per year for three years.  REPA I also included a repurchase option, allowing the sellers to repurchase the property on the third anniversary of the Agreement. REPA I was signed by "James C. Justice" on behalf of JCJC.

b.      By Special Warranty Deed dated December 22, 2014, recorded in Sumter and Clarendon Counties on December 22 and 23, 2014, respectively, JCJC transferred fourteen parcels containing approximately 3,000 acres in Sumter and Clarendon Counties, South Carolina to FPI-CO. These deeds contain pro forma recitals of $5.00 consideration, but the Affidavits of Consideration attached to the deeds state that this is "an arm's length real property transaction and the sales price paid or to be paid in money or money's worth was $11,416,327.12" [for the deed recorded in Clarendon County] and $3,926,261.88 [for the deed recorded in Sumter County]. These deeds reserved a repurchase option by the grantors. These deeds were executed by Governor Justice on behalf of JCJC. Upon information and belief, the transaction evidenced by these deeds were part of the transaction pursuant to REPA I.  Copies of these deeds recorded in Clarendon and Sumter Counties are attached to the original Complaint as Exhibits 21 and 22, respectively.

c.      By Warranty Deed dated December 22, 2014, recorded on December 23, 2014 (Exhibit 23 to the original Complaint), JCJC transferred nine tracts containing over 2,100 acres in Marion County, South Carolina to FPI-CO.  This deed contains a pro forma recital of $5.00 consideration, but the Affidavit of Consideration attached to the deed states that it is "an arm's length real property transaction and the sales price paid or to be paid in money or money's worth was $7,034,063.00."  This deed was executed by Governor Justice on behalf of JCJC.  Upon information and belief, the transaction evidenced by this deed was part of the transaction pursuant to REPA I.

d.      The second real estate purchase agreement, REPA II, contracted to convey eight farms in three states.  On or about June 2, 2015, Jay Justice, individually, JCJC, Justice Farms and Alabama Carbon, LLC, as "Seller" entered into REPA II with FPI-CAR (the "Buyer"), FPI (REIT) and FP Operating Partnership to transfer 15,042 acres of property located in Beaufort, Currituck, Pamlico, Pasquotank, and Perquimans Counties, North Carolina; Marlboro County, South Carolina, and Chesapeake, Virginia to FPI-CO. Upon information and belief, the total consideration for this transaction was over $49,000,000, payable in cash or by wire, 824,398 shares of common stock of FPI (REIT), and 1,993,709 units of limited partnership interest in FP Operating Partnership ("OP Units"), of which 883,723 units were redeemable for cash.    REPA II was signed by "James C. Justice" on behalf of JCJC.  Upon information and belief, the aggregate fair value of the common stock and OP Units was $30,914,634, and the total purchase price for this transaction paid to the Sellers, including the cash consideration, common stock of FPI (REIT) and the OP Units was $80,913,167.  *See* excerpt of FPI Form 10-Q for the quarter ended June 30, 2015 (Exhibit 24 to the original Complaint).

e.      By Special Warranty Deed dated May 29, 2015, recorded on June 3, 2015 (Exhibit 25 to the original Complaint), JCJC and Justice Farms, transferred three farm properties known as REPA Farm 5, 6 and 7, containing over 3,000 acres in Pasquotank County, North Carolina and Perquimans County, North Carolina to FPI-CAR.  The consideration for this transfer was not specified. This Deed reserved a repurchase option by the grantors. This Deed was executed by Governor Justice on behalf of both JCJC and Justice Farms of North Carolina, LLC.  Upon information and belief, the transaction evidenced by this deed was part of the transaction pursuant to REPA II.

44.     JCJC currently is attempting to sell Flowerdew Hundred Plantation, a 1,300 acre property with a 14,000 square foot house in Prince George County, Virginia.  Flowerdew Hundred Plantation previously was listed for sale at $12.2 million. A copy of a listing for this property is attached as Exhibit 26 to the original Complaint.

45.     JCJC currently is attempting to sell Horseshoe Farm, an 880 acre property with a 7,200 square foot house on the Robinson and Rapidan Rivers in Rapidan, Virginia. Horseshoe Farm was previously listed for sale at $9.2 million.  A copy of a listing for this property is attached as Exhibit 27 to the original Complaint.

46.     JCJC currently is attempting to sell Rapidan Farm, a 1,700 acre property in Culpeper, VA. The improvements on the property include a 4,500 square foot main house as well as several other homes. Rapidan Farm previously was listed for sale for $18.8 million. A copy of a listing for this property is attached as Exhibit 28 to the original Complaint.

**Transfers of Kentucky Fuel's Assets to Affiliates and Insiders**

47.     Beginning in 2013, Kentucky Fuel also engaged in a series of transactions designed to transfer its assets with the intent to hinder, delay or defraud its creditors, including Plaintiffs. The transactions that are known at the time of the filing of this Second Amended Complaint relate to the transactions between Kentucky Fuel and New Lead Holdings, Limited, ("New Lead") that are described in various filings in the Fivemile Action, including Plaintiff's Memorandum in Support of Motions for Sanctions and Renewed Motion under Rule 55 Based Upon Changed Circumstances and New Facts (D.E. 357).

48.     In 2013, Kentucky Fuel entered into a series of transactions by which it agreed to assign the Fivemile leases and mining permit to New Lead.  In various agreements relating to that transaction, Kentucky Fuel agreed that certain of New Lead's financial obligations to Kentucky

Fuel would be paid by a company called Hanover Holdings I, LLC ("Hanover"), which was an affiliate of the Magna Group ("Magna").

49.     Part of the consideration paid by New Lead for the Fivemile assets was a promissory note in the original principal amount of $7,500,000, made by New Lead payable to Kentucky Fuel. Kentucky Fuel and New Lead agreed that pursuant to a Debt Purchase Agreement (the "DPA") that was entered into in late 2013, Hanover would purchase three notes totaling $11,000,000 that represented part of the initial purchase price for the Fivemile assets. These included the $7,500,000 note made by New Lead payable to Kentucky Fuel. Hanover would then make payments to Kentucky Fuel pursuant to a payment schedule negotiated between the parties. Thus, the payments by Hanover pursuant to the DPA were actually payments on behalf of New Lead for the valuable Fivemile leases and permit that Plaintiffs had assigned to Kentucky Fuel in the Fourth Amendment.

50.     Upon information and belief, the Defendants used the United States mail and/or wire services in connection with these transfers. For example, Roger D. Hunter, General Counsel for JCJC, Kentucky Fuel, Southern Coal Corporation, and other Justice Enterprise entities confirmed Kentucky Fuel's acceptance of the terms of the New Lead transaction in a letter attached to an email, both dated October 23, 2013, to Ted Claypoole, an attorney representing New Lead at the time. Copies of this email were sent to Steve Ball, Dustin Deane, John McCague, and Lloyd Williams. In this Kentucky Fuel letter, on Southern Coal letterhead, Mr. Hunter explained the payment terms of the deal, including the $7.5 million note New Lead was to pay to Kentucky Fuel. The letter also suggested modifications, such as setting a closing date within the week, conditioning Kentucky Fuel's acceptance "on successful negotiation and execution" of Debt Purchase Agreements between Kentucky Fuel and Magna within two days, and the execution of a number of other documents, including a "Guaranty of Newlead of Magna's obligations to Existing

Noteholders" which included Kentucky Fuel. Mr. Hunter also asked that Mr. Claypoole forward the "acceptance of the Newlead Proposal to Newlead and its Chairman Mr. Zolotas." This email from Mr. Hunter and the accompanying letter are attached to this Second Amended Complaint as Exhibit 33.

51.     The payments owed to Kentucky Fuel for the Fivemile Assets, however, were not made to Kentucky Fuel.  They were instead diverted by wire transfer to Jay Justice's personal brokerage account at Goldman Sachs and to Justice Management Services.  These payments include the following:

| Date | Amount | Recipient |
|------|--------|-----------|
| 12/23/13 | $508,575 | James C. Justice, III Brokerage Acct. |
| 1/6/14 | $500,000 | James C. Justice, III Brokerage Acct. |
| 1/17/14 | $500,000 | James C. Justice, III Brokerage Acct. |
| 2/19/14[2] | $339,050 | James C. Justice, III Brokerage Acct. |
| 2/26/14 | $339,050 | Justice Management Services |
| 3/31/14 | $1,084,960 | Justice Management Services |
| 4/30/14 | $1,084,960 | Justice Management Services |
| 6/2/14 | $1,084,960 | Justice Management Services |
| 6/16/14 | $2,068,205 | Justice Management Services |

52.     Employees working for the companies within the Justice Enterprise used email communications to instruct others how to wire these amounts to Justice Management Services and Jay Justice's brokerage account that should have gone to Kentucky Fuel. In a December 20, 2013 email, Roger Hunter, provided wire instructions to Marc Manuel at Magna so that Magna could wire the funds. Copied on this email exchange were Steve Ball and Dustin Deane of JCJC, as well as other Magna representatives. The account name and number that the JCJC's General Counsel provided, however, was for Jay Justice's personal brokerage account at Goldman Sachs. Marc Manuel confirmed this wire transfer was made four days later in an email in which Roger Hunter

was copied, among others. This email exchange is attached as Exhibit 34. [13cc]

53. Max Riccio of Magna also confirmed two of the wire transfers listed above in the amounts of $500,000 each to Kentucky Fuel (ostensibly) in January 6, 2014 and January 17, 2014 emails to Marc Manuel of Magna and Michael Zolotas of NewLead Holdings, Ltd. Roger Hunter was copied to both of these emails. These email exchanges are attached hereto as Exhibit 35.

54. The Plaintiffs have learned of another transfer involving coal mines conveyed to FR Performance, LLC. FR Performance, LLC is an entity wholly owned by Freddie Revis, an equipment manager for Justice. Dustin Deane, an inhouse attorney for the Defendants, drafted and filed the organizing documents for FR Performance, LLC with the Virginia Secretary of State to enable soon-to-follow conveyances. Between July and September 2018, the Defendants caused the transfer of ownership of multiple mines located in Harlan and Pike County, Kentucky to FR Performance, LLC. Upon information and belief, Mr. Revis does not have the independent financial wherewithal or expertise to purchase and operate these mines. The Plaintiffs' investigation continues but, upon information and belief, the Defendants made these transfers to Mr. Revis's company in an efforts to further shield their assets and this was accomplished with the legal assistance of their in-house attorney. Although the Plaintiffs' do not now know all the details of these transactions, Plaintiffs believe that discovery will show that little to no consideration changed hands for these mine conveyances.

55. These descriptions are but examples of how persons within the Justice Enterprise used wires and emails to receive income derived from a pattern racketeering activity, acquire or maintain an interest in or control of the Justice Enterprise, and conduct or participate in the conduct of the Justice Enterprises' affairs. These examples are not intended to be exhaustive. Defendants'

---

[2] This transfer to Mr. Justice may not have been completed.

use of wires and emails, being indictable under 18 USC §§ 1341 and 1343, provide predicate acts upon which their pattern of racketeering activity rests.

**The Bluestone Transaction**

56.     The Justices, JCJC, Bluestone Industries, Dynamic Energy, JCJ Coal Group, and Bluestone Resources also have engaged in a series of transactions designed to transfer the assets of other Justice entities with the intent to hinder, delay or defraud its creditors, including Plaintiffs.

57.     Upon information and belief, in 2009 the Justices, James C. Justice II, as Trustee of the trusts James C. Justice II GRAT No. 1 and James C. Justice II GRAT No. 2 and Jill Justice, transferred to Russian steel producer Mechel Bluestone, Inc., and Mechel Mining OAO (jointly, "Mechel") certain entities and/or their assets.   All of the details of this transaction are not yet known to Plaintiffs, but the transactions are described upon information and belief in the following paragraphs.

58.     Upon information and belief, the entities transferred were Bluestone Industries, Dynamic Energy, and JCJ Coal Group, (together, "Original Bluestone"), which owned certain coal properties and related assets in West Virginia.  This transfer was made pursuant to a merger agreement with Mechel (the "Merger Agreement").  The Original Bluestone Companies were merged into Mechel Bluestone, Inc., which was a holding company.

59.     The Merger Agreement provided that if additional coal were discovered on the Bluestone Properties within two years, then Mechel would pay Justice an additional amount based upon the amount of additional coal discovered (the "Contingent Payment").

60.     As part of the consideration for its purchase of Original Bluestone, Mechel agreed to pay $436 million in cash, approximately 83.3 million shares of preferred stock in Mechel OAO (worth an estimated $1.5 billion), and the Contingent Payment, which was based upon coal reserves

as determined in a subsequent engineering report. Mr. Steve Ball estimated that, based upon the estimated additional coal reserves, the Contingent Payment should have been approximately $180 million. Pursuant to the Merger Agreement, another company estimated that there were approximately 60 million tons of additional reserves, which would have equated to a Contingent Payment of approximately $165 million.

61.     Upon information and belief, at the time of the sale of Original Bluestone to Mechel, JCJC owned approximately 19% of Original Bluestone.  JCJC's share of the Contingent Payment therefore was approximately $31,350,000 (based upon a Contingent Payment of $165 million).

62.     Upon information and belief, in 2015 the Justices and Mechel negotiated a transaction whereby the Justices would repurchase Original Bluestone and/or the Bluestone Assets by acquiring 100% of the shares in Mechel Bluestone, which held the coal assets formerly held by Original Bluestone.  In 2015, the Justices formed or caused to be formed a new entity, Bluestone Resources ("New Bluestone") to acquire Mechel and the Bluestone Assets. Upon information and belief the Justices own 100% of New Bluestone (Governor Justice 60% and Jay Justice 40%)

63.     Upon information and belief, the Justices agreed that the consideration to Mechel for the repurchase of what had previously been the Original Bluestone, which originally was at least approximately $600 million ($165 million in cash and the Contingent Payment) in addition to the Mechel stock, was a total of approximately $170 million.  That approximate $170 million purchase price consisted of $5 million in cash and cancellation of the obligation to pay the Contingent Payment of approximately $165 million.  Of this consideration, approximately $31,350,000 came from JCJC, representing its share of the Contingent Payment. This transfer of the Bluestone Assets to New Bluestone, owned 100% by Governor Justice and Jay Justice was done with the intent, and had the effect, of stripping JCJC's interest in the Contingency Payment, and diverting that value to

the Justices through their 100% interest in New Bluestone.  The Justices, who had previously owned only part of Original Bluestone acquired 100% of its assets at the expense of JCJC, thereby transferring and extinguishing JCJC $31,350,000 interest in the Contingent Payment.  This transfer was made for no consideration or for inadequate consideration to JCJC.

64.     Upon information and belief, the Defendants utilized the mail and wires in a manner that violates of federal law as part of the Bluestone transaction.

## COUNT I
## (Fraudulent Transfers)

65.     Plaintiffs reaffirm and reallege the allegations of the above paragraphs as if set forth fully herein.

66.     The transfers of real property and other assets described above by JCJC and Kentucky Fuel were made without valuable consideration.  They were made with the actual intent to hinder, delay or defraud Plaintiffs, who were creditors of JCJC and Kentucky Fuel.

67.     JCJC did not receive a reasonably equivalent value in exchange for the transfers described in paragraphs 32-40, above, and it was engaged in a business for which its remaining assets were unreasonably small in relation to the business.

68.      Kentucky Fuel did not receive a reasonably equivalent value in exchange for the transfers described in paragraphs 41-47, above and it was engaged in a business for which its remaining assets were unreasonably small in relation to the business.

69.     The transfers by JCJC described herein that were made after it was served with the original Complaint in the Fivemile Action and, in any event, after the Magistrate Judge's initial Report and Recommendation for sanctions and default judgment on March 25, 2013, were made because JCJC believed that it would incur debts beyond its ability to pay or which it did not desire to pay as they became due.

70. The transfers of Kentucky Fuel's assets described in paragraphs 41-47, above, were made when Kentucky Fuel believed that it had incurred or would incur debts beyond its ability to pay as they became due. Upon information and belief, Kentucky Fuel was insolvent or was rendered insolvent by such transfers.

71. The transfers described above were made at a time when JCJC and Kentucky Fuel were not paying their debts as they became due. JCJC and Kentucky Fuel were not paying either the monthly retainer fees or the rents due under the lease of the Strong Brothers Property when due. Prior to 2016 they were not paying the minimum royalties due under the Fourth Amendment when they were due. As a result, JCJC and Kentucky Fuel were presumptively insolvent at the time of these transfers. In addition, upon information and belief, JCJC and Kentucky Fuel and their affiliates were not paying mine safety fines, taxes and federal and state tax liens as these debts became due. *See* Exhibit 29 to original Complaint.

72. JCJC and Kentucky Fuel also have represented that Plaintiffs would have difficulty in collecting a judgment against them. They have represented that they would have to file bankruptcy if Plaintiffs were awarded a judgment in the Fivemile Action in the amount originally recommended by the Magistrate Judge.

73. Because the conveyances executed by Jay Justice as described herein constituted fraudulent and tortious conduct, he is personally liable for the damages caused thereby.

74. Defendants' actions described herein violate the Kentucky Fraudulent Conveyance Act, KRS Chapter 378, §§ 378.010, et seq., including §§ 378.010 – 378.030, and the Kentucky Uniform Voidable Transactions Act, KRS Chapter 378A, § 378A.010, et seq., including §§ 378A.040 and 378A.050, entitling Plaintiffs to the remedies provided by those statutes and at common law.

75.     Alternatively, Defendants' actions described herein violate the Virginia Fraudulent Conveyance Act, Code of Virginia § § 55-80 and 55-81 and the common law of Virginia.

76.     As a direct and proximate result of the above transfers and Defendants' actions described herein, the Plaintiffs have been damaged in that the Defendants have transferred Justice Companies' and Kentucky Fuel's assets in a manner that will prevent Plaintiffs from collecting the full amount of the debt owed by these Defendants to them, absent relief by this Court.

77.     The Defendants' conduct in making the fraudulent conveyances described herein was intentional and/or involving oppression, fraud, or malice, thereby entitling Plaintiffs to an award of punitive damages.

## COUNT II
### (Conspiracy)

78.     Plaintiffs reaffirm and reallege the allegations of the above paragraphs as if set forth fully herein.

79.     Jay Justice, Justice Farms, Southern Minerals, Oakhurst Club, and Justice Management Services (the "Co-Conspirators") (collectively with JCJC and Kentucky Fuel, the "Conspirators") entered into an agreement or combination to accomplish an unlawful act by defrauding Plaintiffs by fraudulently transferring or liquidating the assets of JCJC as described herein.

80.     As set forth above, Jay Justice, individually was a transferee of certain of the fraudulent conveyances of JCJC's assets. As such, and because he was acting to benefit himself personally and individually, he was not acting in the interest of JCJC. Thus, he stood as a third party with respect to JCJC and Plaintiffs.

81.     This agreement was an unlawful and corrupt agreement by the Conspirators to accomplish an unlawful goal of fraudulently transferring or liquidating valuable real estate and

belonging to JCJC, so that Plaintiffs could not collect the debts owed to them by JCJC.

82.     The Co-Conspirators acted in concert with JCJC to make the fraudulent conveyances described herein and pursuant to a common design with JCJC to accomplish this unlawful goal.

83.     The Co-Conspirators knew that JCJC's conduct described herein constituted a breach of duty and gave substantial assistance or encouragement to JCJC to breach its duties and accomplish its unlawful goal.

84.     Jay Justice, Kentucky Fuel and Justice Management Services entered into an agreement or combination to accomplish an unlawful act by defrauding Plaintiffs by fraudulently transferring or liquidating the assets of Kentucky Fuel as described herein.

85.     As set forth above, Jay Justice, individually was a transferee of certain of the assets of Kentucky Fuel.  As such, and because he was acting to benefit himself personally and individually, he was not acting in the interest of Kentucky Fuel.  Thus, he stood as a third party with respect to Kentucky Fuel and Plaintiffs.

86.     This agreement between Kentucky Fuel, Jay Justice and Justice Management Services was an unlawful and corrupt agreement to accomplish an unlawful goal of fraudulently transferring or liquidating monies owed to Kentucky Fuel, so that Plaintiffs could not collect the debts owed to them by Kentucky Fuel.

87.     Jay Justice, Justice Management Services and Kentucky Fuel acted in concert to make the fraudulent conveyances described herein and pursuant to a common design to accomplish this unlawful goal.

88.     Jay Justice and Justice Management Services knew that Kentucky Fuel's conduct described herein constituted a breach of duty and gave substantial assistance or encouragement to

Kentucky Fuel to breach its duties and accomplish its unlawful goal.

89.     As a direct and proximate result of the unlawful conspiracies described herein, Plaintiffs have been damaged.

90.     Jay Justice, Governor Justice, JCJC, Original Bluestone, and New Bluestone (the "Bluestone Co-Conspirators") entered into an agreement or combination to accomplish an unlawful act by defrauding Plaintiffs by fraudulently transferring or liquidating the assets of JCJC as described herein.

91.     As set forth above, Jay Justice and Governor Justice, individually, were transferees of certain of the fraudulent conveyances of JCJC's assets.  As such, and because they were acting to benefit themselves personally and individually, they were not acting in the interest of JCJC.  Thus, they stood as a third parties with respect to JCJC and Plaintiffs.

92.     This agreement was an unlawful and corrupt agreement by the Bluestone Co-Conspirators to accomplish an unlawful goal of fraudulently transferring or liquidating valuable real estate and belonging to JCJC, so that Plaintiffs could not collect the debts owed to them by JCJC.

93.      The Bluestone Co-Conspirators acted in concert with JCJC to make the fraudulent conveyances described herein and pursuant to a common design with JCJC to accomplish this unlawful goal.

94.     The Bluestone Co-Conspirators knew that JCJC's conduct described herein constituted a breach of duty and gave substantial assistance or encouragement to JCJC to breach its duties and accomplish its unlawful goal.

## COUNT III
### (RICO)

95.     Plaintiffs reaffirm and reallege the allegations of the above paragraphs as if set forth fully herein.

96.    Defendants' actions described above violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 USC § 1962.

97.    The operation of the Justice Enterprise as described above affects interstate and foreign commerce, as evinced by its Bluestone transaction with Russian businesses.

98.    Defendants are all persons associated with the Justice Enterprise who have engaged in fraudulent transfers of assets, money, and real property. These transfers involved the transferring of things of value from one Justice Enterprise entity to another so as to deprive creditors like the Plaintiffs of payments to which they are entitled, thus establishing a purpose other than the predicate acts.

99.    Defendants participated, either directly or indirectly, in directing or management of the conduct or affairs of the Justice Enterprise and knowingly carried out decisions made on its behalf.

100.   The Defendants' fraudulent transfers were conducted through the use of mail and wires, and amount to violations of the federal wire and mail fraud statutes (18 USC §§ 1341 and 1343), which each amount to predicate acts. Taken together, the Defendants' series of fraudulent transfers made in violation of the federal wire and mail fraud statutes constitute a pattern of racketeering activity in furtherance of the scheme. These related activities have been taking place for a significant time period, as noted by numerous news articles (some of which are attached as exhibits), and are likely to continue to occur.

101.   Defendants have received income derived, directly or indirectly, from their pattern of racketeering activity as described herein. Defendants have used or invested, directly or indirectly, some part of such income, or the proceeds thereof, in the establishment or operations of the Justice Enterprise. Thus, Defendants have thereby violated RICO, §1962(a).

102.     Defendants, through the pattern of racketeering activity described herein, have acquired or maintained control, directly or indirectly of the Justice Enterprise, all in violation of RICO §1962(b).

103.     Defendants are associated with the Justice Enterprise and have conducted or participated, directly or indirectly, in the affairs of the Justice Enterprise, through a pattern of racketeering activity by committing multiple acts of mail fraud or wire fraud. Defendants' actions described herein violate §1962(c) of the RICO Act.

104.     Defendants' fraudulent activities were perpetuated with the conscious intent to execute a scheme to mislead and defraud Plaintiffs as creditors of JCJC.

105.     As a direct and proximate result of Defendants' conduct and violation of the RICO Act, Plaintiffs have suffered damages in an amount that has not been determined, but which is believed to exceed $1,000,000. Plaintiffs are further entitled to recover treble damages.

## COUNT IV
### (Attorneys' Fees and Costs)

106.     Plaintiffs reaffirm and reallege the allegations of the above paragraphs as if set forth fully herein.

107.     This action is a lawsuit that relates to the Fourth Amendment.  The Plaintiffs therefore are entitled to recover from JCJC and Kentucky Fuel, all costs, fees and expenses, including attorneys' fees and expenses, incurred in connection with this action.  The remaining Defendants are vicariously liable for such fees and expenses as Co-Conspirators.

108.     Plaintiffs are further entitled to recover their reasonable attorneys' fee and costs pursuant to Code of Virginia § 55-82.1.

WHEREFORE, Plaintiffs pray that the Court take jurisdiction of this matter and grant them the following relief.

(1)     Judgment against the Defendants, James C. Justice, II, James C. Justice, III, James C. Justice Companies, Inc., Justice Farms of North Carolina, LLC, Oakhurst Club, LLC, Southern Minerals, LLC, Bluestone Resources, Inc., Justice Management Services, LLC, Bluestone Industries, Dynamic Energy, JCJ Coal Group, Bluestone Resources, and any immediate or mediate transferees of the first transferees described herein, other than one who took in good faith for value, for compensatory damages in the amount of any judgment awarded to Plaintiffs in the Fivemile Action or the value of the properties transferred, whichever is less;

(2)     An award of punitive damages in the amount of at least $16,990,000;

(3)     A judgment that the transfers described herein are made with actual intent to hinder, delay or defraud Plaintiffs void;

(4)     Judgment for three times the amount of Plaintiffs' actual damages, including attorneys' fees, pursuant to 18 USC § 1964(c);

(5)     A lien *lis pendens* or an attachment of the properties transferred or other property of the transferees, as may be permitted by law;

(6)     All Plaintiffs' attorneys' fees and costs incurred in connection with this action; and such other relief as the circumstances may require, including pre-judgment interest and the costs of these proceedings.

/s/ W. Edward Shipe
*John A. Lucas (011198)
*W. Edward Shipe (023887)
**Howard & Howard, P.C.**
4820 Old Kingston Pike
Knoxville, Tennessee 37929
865.588-4091 (telephone)
865.588-4206 (facsimile)
jlucas@howardhowardlaw.com
eshipe@howardhowardlaw.com
***admitted pro hac vice***


/s/ Scott M. Webster
Scott M. Webster
Tooms, Dunaway & Webster
1306 West Fifth Street, Suite 200
P.O. Box 905
London, Kentucky 40743-0905
606.864.4145 (telephone)
606.878.5547 (facsimile)
swebster@toomsdunaway.com

***Counsel for New London Tobacco Market, Inc., and Fivemile Energy, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been served electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt of this 29th day of April, 2019.


/s/ W. Edward Shipe